UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

KARA LYNN RYHERD,           )
                            )
            Plaintiff,      )
                            )
    v.                      )        No.  2:18 CV 116 CDP
                            )
ANDREW M. SAUL,             )
Commissioner of Social Security,[1] )
                            )
            Defendant.      )

## MEMORANDUM AND ORDER

Plaintiff Kara Lynn Ryherd brings this action under 42 U.S.C. § 405(g) seeking judicial review of the Commissioner's denial of her application for disability benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401, *et seq.*  Because the Commissioner's final decision is not supported by substantial evidence on the record as a whole, I will reverse the decision and remand for further proceedings consistent with this Order.

## I.    Procedural History

On November 17, 2015, Ryherd proactively filed an application for DIB alleging a period of disability beginning August 21, 2014.  In her application,

---

[1] On June 17, 2019, Andrew M. Saul became the Commissioner of Social Security.  Pursuant to Fed. R. Civ. P. 25(d), Saul is substituted for Deputy Commissioner Nancy A. Berryhill as defendant in this action.

Ryherd alleged several physical and mental impairments, including degenerative disc disease of the lower and mid-back, lumbar bulging disc, lumbar bone spurs, sciatica, degenerative joint disease of the right knee, depression, anxiety, sleep apnea, thyroid disorder, and osteopenia.  Ryherd's claim was denied on March 1, 2016, and upon reconsideration on June 22, 2016.  A hearing was held before an administrative law judge (ALJ) on November 1, 2017, at which Ryherd and a vocational expert testified.

On May 7, 2018, the ALJ issued a decision finding that Ryherd had several severe physical impairments, including degenerative joint disease in the right knee, degenerative disc disease of the thoracic and lumbar spine, sleep apnea, and osteoarthritis.  The ALJ held that her various other alleged physical and mental impairments were not severe, in isolation or in combination.  The ALJ ultimately denied Ryherd's claim for DIB, finding the vocational expert's testimony to support a finding that Ryherd retained the residual functional capacity (RFC) to perform her past relevant work as a retail store manager and area manager.  On October 16, 2018, the Appeals Council denied Ryherd's request for review of the ALJ's decision.  The ALJ's decision is thus the final decision of the Commissioner.  42 U.S.C. § 405(g).

In this action for judicial review, Ryherd claims that the ALJ's decision is not supported by substantial evidence on the record as a whole.  Briefly, Ryherd

argues that the ALJ failed to adequately evaluate the severity and failed to develop

the record on Ryherd's alleged medical impairments including fibromyalgia,

depression, anxiety, bilateral carpal tunnel syndrome, bilateral shoulder tendinosis,

dyslexia, and sleep apnea.  Consequently, Ryherd argues the ALJ erred in

assessing her RFC by failing to consider all of her impairments and limitations.

## II.      Evidence Before the ALJ

A. Testimony of Plaintiff

At the hearing on November 1, 2017, Ryherd testified in response to

questions posed by the ALJ and counsel.  At the time of the hearing, Ryherd was

forty-seven years of age, stood approximately 5'5" tall and weighed 180 pounds.

Ryherd lived in a house on a 123-acre farm with her husband, who ran a livestock

business on the property.  Ryherd received an Associate of Arts degree in business

management.  (Tr. 42-44.)

Ryherd's Work History Report shows that she worked as a store manager for

a grocery store from January 1997 to December 2002.  Ryherd then worked as a

deli supervisor at a Walmart from February 2003 until September 2004.  From

October 2004 to January 2008, Ryherd worked as an assistant manger at

Gamestop, a videogame retailer.  Ryherd transitioned to an area manager position

with Gamestop in January 2008, and remained in the position until August 21,

2014, when she was placed on administrative leave following a spinal fusion and

disc replacement surgery.  Ryherd testified that she was unable to return to work at Gamestop because her doctor would not give her clearance to return, and that she was not successful in ensuing attempts to find work in administrative or management-type positions because she was physically unable to perform job-related tasks.  (Tr. 44-46, 234.)

In response to questions posed by the ALJ, Ryherd testified that she has pain and limited motion in both shoulders, and that the pain prevents her from lifting or moving her left shoulder above her chest.  (Tr. 49-50.)  As to her exertional limitations, Ryherd testified that her shoulder pain prevents her from performing tasks like driving with her left arm or for long distances, using a cash register, handling money, using a keyboard, lifting work displays, and loading or unloading trucks.  (Tr. 52-53, 56.)  Ryherd also testified that her pain causes difficulty with or prevents her from performing personal and household tasks, including bathing and washing her hair, getting dressed, doing laundry and folding clothes, vacuuming, shopping for and lifting objects heavier than approximately five pounds, and assisting with the feeding and care of farm animals on the Ryherd's property.  (Tr. 54, 57, 65-67).  However, Ryherd testified that she is able to assist with some farm-related paperwork for a couple hours a week, including some accounting tasks and ordering feed and medicine for the animals, and also testified that she can perform certain home and personal activities like cooking (if someone prepares the

heavier pots and pans and she cooks while seated), sweeping the kitchen floor, feeding her dogs, and mowing a two-acre portion of her yard while seated on a riding mower.  (Tr. 57, 65-66.)

Ryherd testified that she has recurring sciatic nerve pain in her lower S1-L5 vertebra which causes fluctuating degrees of pain in both of her legs, sometimes so severe that she is unable to stand up straight.  She also testified that she has limited mobility and cannot bend her knees or kneel, and that she has severe pain in her right knee, due primarily to two surgeries on her right knee.  (Tr. 51-52.)  Ryherd testified that she has had a cane since 2014, and has regularly used the cane for mobility and right knee stability since June 2017.  She stated that she cannot remain on her feet either walking or standing for longer than fifteen minutes at a time, and that she cannot walk a city block, but that she had little trouble moving from her car to the courtroom for the hearing.  Ryherd asserted that she has to elevate her legs a couple times a day for approximately an hour each time.  She also testified that she cannot sit comfortably for longer than an hour due to pain in her lower back and buttocks.  (Tr. 53-56.)

Ryherd also testified that she is in constant pain from what she believes to be rheumatoid arthritis, which has caused her to lose strength and dexterity in her hands.  She testified that she cannot write for more than a few minutes before her hands cramp, that she would not be able to remove a lid from a jar, that she could

maybe use a screwdriver, and that she cannot count coins or bills.  (Tr. 52-53.) Ryherd testified that her generalized pain has gradually become more severe over time, and that it is sometimes so severe that it clouds her focus and she is unable to think straight.  (Tr. 72.)

As to her mental impairments, Ryherd testified that she has long-term anxiety and, more recently, depression due in part to the mental and emotional toll of her worsening physical condition.  She testified that she regularly takes all prescribed medication, but that the medication causes side effects including severe dry mouth, general fogginess, forgetfulness, and difficulty speaking.  (Tr. 55.) Ryherd testified that she has been consistently attending therapy sessions with a therapist, despite expressing reservations over the value of therapy in her first session.  (Tr. 56.)

## B. Testimony of Vocational Expert

Terri Crawford, a vocational expert, testified at the hearing in response to questions posed by the ALJ and counsel.

Ms. Crawford testified that Ryherd's past work as a department manager at Walmart was classified by the Directory of Occupational Tables (DOT) as skilled labor, medium exertional level.  Her work both as the store manager and assistant manager at Gamestop were classified as skilled labor, light exertional level as generally performed in the national economy, but medium exertional level as

performed by Ryherd.  Her work as an area manager at Gamestop was classified as skilled labor, sedentary exertional level as generally performed in the national economy, but medium exertional as performed by Ryherd.  (Tr. 73-74.)

The ALJ asked Ms. Crawford to assume an individual of Ryherd's age, education, and work experience, and further, that the individual performed work at the light exertional level and could occasionally climb ramps, stairs, balance, stoop, and crouch, but not kneel, crawl, or climb ladders, rope, or scaffolds.  Ms. Crawford testified that such a person could perform Ryherd's past work as a store manager and area manager based on the DOT, but not based on Ryherd's testimony, which required medium exertional level.  Ms. Crawford further testified that if the same hypothetical individual performed work at the sedentary exertional level, the individual could perform only Ryherd's past work as an area manager as in the DOT, but not as in her testimony.  Ms. Crawford also testified that if the hypothetical adds that the individual must use a single-point cane while walking at all times, the individual could not perform any of Ryherd's past work, and that there was no work in the national economy that would fit that profile.  (Tr. 74-76.)  In response to questioning by counsel, Ms. Crawford testified that if an individual were off task for 20% of a work shift due to pain or side effects from medication, such a condition would not be consistent with maintaining competitive employment.  (Tr. 76.)

- 7 -

C. Ryherd's Medical Records

With respect to Ryherd's medical records and the other evidence of record, I adopt Ryherd's recitation of facts set forth in her Statement of Uncontroverted Facts (ECF 17-1) and note that they are admitted *in toto* by the Commissioner.  I also adopt the factual statements set out in the Commissioner's Statement of Additional Material Facts (ECF 22-1).  Ryherd has a complex and particularly voluminous medical history—while the statements submitted by the parties do not fully summarize the record, I find that the statements provide a generally fair and accurate description of the relevant record before the Court, and that there would be little value in summarizing the majority of the records in more detail in this Order.  However, a summary of the evidence pertaining to Ryherd's alleged fibromyalgia is presented in the following section, as a thorough discussion of the evidence is warranted.

## III.    Discussion

A. Legal Standard

To be eligible for SSI under the Social Security Act, Ryherd must prove that she is disabled.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines disability as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner engages in a five-step evaluation process to determine whether a claimant is disabled. *See* 20 C.F.R. § 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). At Step One, the ALJ determines whether the claimant is currently engaged in substantial gainful activity. At Step Two, the ALJ considers whether the claimant has a "severe" impairment or combination of impairments. At Step Three, the ALJ determines whether the severe impairment(s) meets or medically equals the severity of a listed impairment; if so, the claimant is determined to be disabled, and if not, the ALJ's analysis proceeds to Step Four.

At Step Four of the process, the ALJ must assess the claimant's residual functional capacity (RFC) – that is, the most the claimant is able to do despite her physical and mental limitations, *Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011) – and determine whether the claimant is able to perform her past relevant work. *Goff v. Barnhart,* 421 F.3d 785, 790 (8th Cir. 2005) (RFC assessment

occurs at fourth step of process).  If the claimant is unable to perform her past work, the Commissioner continues to Step Five and determines whether the claimant, with her RFC and other vocational factors, can perform other work as it exists in significant numbers in the national economy.  If so, the claimant is found not disabled, and disability benefits are denied.

The claimant bears the burden through Step Four of the analysis.  If she meets this burden and shows that she is unable to perform her past relevant work, the burden shifts to the Commissioner at Step Five to produce evidence demonstrating that the claimant has the RFC to perform other jobs in the national economy that exist in significant numbers and are consistent with her impairments and vocational factors such as age, education, and work experience.  *Phillips v. Astrue*, 671 F.3d 699, 702 (8th Cir. 2012).

I must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion.  *Jones*, 619 F.3d at 968. Determining whether there is substantial evidence requires scrutinizing analysis. *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007).

I must consider evidence that supports the Commissioner's decision as well

as any evidence that fairly detracts from the decision.  *Boyd v. Colvin*, 831 F.3d 1015, 1020 (8th Cir. 2016).  If, after reviewing the entire record, it is possible to draw two inconsistent positions and the Commissioner has adopted one of those positions, I must affirm the Commissioner's decision.  *Id.*  I may not reverse the Commissioner's decision merely because substantial evidence could also support a contrary outcome.  *Fentress v. Berryhill*, 854 F.3d 1016, 1021 (8th Cir. 2017).

B.  The ALJ's Decision

In his written decision, the ALJ found that Ryherd had not engaged in substantial gainful activity since August 21, 2014, the alleged onset date of disability.

The ALJ found that Ryherd's degenerative joint disease of the right knee (status-post surgery), degenerative disc disease of the thoracic and lumbar spine (status-post L5-S1 fusion and discectomy), sleep apnea, and osteoarthritis were severe impairments which significantly limited Ryherd's ability to perform basic work activities.  The ALJ found that several other medically determinable impairments were reflected in the record, including gastroesophageal reflux disease, asthma, hypothyroidism, status post debridement of the great right toe, bilateral carpal tunnel syndrome, lipoma, and right and left shoulder tendinosis, but held that they were not severe either because did not cause more than a minimal effect on Ryherd's ability to work, or because they did not last or were not

- 11 -

expected to last at least twelve consecutive months.  (Tr. 18.)  The ALJ further held that Ryherd's alleged rheumatoid arthritis and fibromyalgia were not medically determinable impairments due to insufficient evidence in the record to support a finding of either condition.  (Tr. 19-20.)

The ALJ also found that Ryherd's medically determinable impairments of depression, anxiety, alcohol use disorder, and methamphetamine abuse, considered singly and in combination, did not cause more than a minimal limitation in Ryherd's ability to perform basic mental work and were therefore non-severe.  (Tr. 18.)  The ALJ held that Ryherd's alleged dyslexia to be a non-medically determinable impairment due to a lack of evidence in the record that she ever received a diagnosis.  (Tr. 20.)

At Step Four, the ALJ determined that Ryherd had the RFC to:

perform light work as defined in 20 CFR 404.1567(b), except that she can never climb ladders, ropes, or scaffolds; can occasionally climb ramps or stairs; can occasionally balance, stoop, and crouch; and can never kneel or crawl.

In light of this RFC assessment, the ALJ determined that Ryherd was capable of performing her past relevant work as a retail store manager and as an area manager as generally performed in the national economy.  (Tr. 21, 24.)  The ALJ also considered the testimony of the vocational expert and held it was consistent with a finding that Ryherd could return to her past relevant work in both managerial positions.  (Tr. 24.)  The ALJ thus found that Ryherd was not under a disability

since August 21, 2014.  (Tr. 25.)

C. <u>Analysis</u>

### Fibromyalgia

While Ryherd raises many issues in her brief, her most significant argument concerns the ALJ's Step Two evaluation of her alleged fibromyalgia and his determination that it was a non-medically determinable impairment.  Because the ALJ concluded that Ryherd did not have a medically determinable impairment of fibromyalgia, he did not proceed with the remaining steps of the sequential evaluation process, thus he did not consider the effects of her fibromyalgia, alone or in combination with her other impairments, in developing her RFC at Step Four. Accordingly, the ALJ's conclusion that Ryherd's fibromyalgia was a non-medically determinable impairment is not harmless and must be evaluated further due to the "potentially[] cascading implications at steps two through five." *See Banks v. Colvin*, No. 2:15 CV 53 JMB, 2016 WL 4396166, at *8 (E.D. Mo. Aug. 18, 2016).

For the reasons that follow, I conclude that the ALJ's finding that Ryherd did not have a medically determinable impairment of fibromyalgia is not supported by substantial evidence, and so this matter must be remanded for further proceedings.

- 13 -

i.      *Medical and Procedural Background*

"Fibromyalgia is a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months."  Soc. Sec. Ruling, SSR 12-2p; *Titles II & Xvi: Evaluation of Fibromyalgia*, SSR 12-2P, 2012 WL 3104869, at *1 (S.S.A. July 25, 2012).  "[Fibromyalgia] often leads to a distinct sleep derangement which often contributes to a general cycle of daytime fatigue and pain."  *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998) (citation omitted).   The Eighth Circuit has long recognized that fibromyalgia can be disabling.  *Id*; *see also Forehand v. Barnhart,* 364 F.3d 984, 987 (8th Cir. 2004).  Accordingly, SSR 12-2p states that fibromyalgia should be analyzed under the traditional five-step evaluation process; however, prior to evaluating fibromyalgia under the sequential evaluation process, the Commissioner must determine whether a claimant's fibromyalgia is a medically determinable impairment.  *Id*. at *2.

"Fibromyalgia has long been recognized by the courts as an elusive diagnosis; its 'cause or causes are unknown, there's no cure, and, of greatest importance to disability law, it's symptoms are entirely subjective.'"  *Waters v. Astrue*, No. 2:09 CV 28 DDN, 2010 WL 2522702, at *8 (E.D. Mo. June 16, 2010) (quoting *Tilley v. Astrue,* 580 F.3d 675, 681 (8th Cir. 2009)).  SSR 12-2p "provides guidance on how [the Commissioner will] develop evidence to establish that a

person has a medically determinable impairment (MDI) of fibromyalgia (FM), and how [the Commissioner will] evaluate [fibromyalgia] in disability claims . . . ." SSR 12-2p at *1.

A claimant can establish that she has a medically determinable impairment of fibromyalgia "by providing evidence from an acceptable medical source," which includes licensed physicians like medical or osteopathic doctors. *Id*. However, a fibromyalgia diagnosis alone is insufficient; "[t]he evidence must document that the physician reviewed the person's medical history and conducted a physical exam," and the physician's treatment notes must be evaluated "to see if they are consistent with the diagnosis of [fibromyalgia]." *Id*. SSR 12-2p outlines two sets of criteria to evaluate the evidence of a claimant's fibromyalgia—the 1990 American College of Rheumatology Criteria for the Classification of Fibromyalgia, (the 1990 ACR criteria), and the 2010 American College of Rheumatology Preliminary Diagnostic Criteria (the 2010 ACR criteria). *Id*. Under the 1990 ACR Criteria, a claimant may be found to have a medically determinable impairment of fibromyalgia if the claimant has all three of the following:

> 1) A history of widespread pain—that is, pain in all quadrants of the body (the right and left sides of the body, both above and below the waist) and axial skeletal pain (the cervical spine, anterior chest, thoracic spine, or low back)—that has persisted (or that persisted) for at least 3 months. The pain may fluctuate in intensity and may not always be present; 2) At least 11 positive tender points on physical examination. The positive tender points must be found bilaterally (on the left and right sides of the body) and both above and below the

waist; . . . 3) Evidence that other disorders that could cause the symptoms or signs were excluded.  Other physical and mental disorders may have symptoms or signs that are the same or similar to those resulting from [fibromyalgia]. . . .

*Id*. at *2-3.  In sum, "[the Commissioner] will find that a person has a medically determinable impairment of fibromyalgia if the physician diagnosed fibromyalgia and provides the evidence we describe in section II.A or section II.B, and the physician's diagnosis is not inconsistent with the other evidence in the person's case record."  *Id*.

After properly identifying the 1990 ACR criteria, the ALJ offered the following analysis of Ryherd's alleged fibromyalgia:

> In October 2016, Haraldine A. Stafford found multiple tender points on the claimant (Ex. 32F/5; *see also* 43F/3).  In January 2017, Julia Ruth Crim, MD, reported that the claimant suffered from fibromyalgia and recommended that she join a fibromyalgia support group (Ex. 33F/2, 3).  In April 2017 a medical provider reported that the claimant's "foggy headedness, dizziness, [and] head feeling swollen [] could be related to fibromyalgia" (Ex. 35F/3).  However, the record does not support a finding that the claimant meets all three of the [1990 ACR] criteria.  Accordingly, there is insufficient evidence demonstrating that fibromyalgia is a medically determinable impairment as required under SSR 12-2p.

(Tr. 20.)

Ryherd argues that the ALJ improperly evaluated the evidence in rejecting her fibromyalgia diagnosis.  Ryherd claims that "three treating physicians found reasons to consider fibromyalgia as an impairment, at least one of whom did diagnose it."  ECF 17 at pg. 6.  Ryherd first notes that Dr. Ebby George

- 16 -

Varghese—not Dr. Crim as the ALJ mistakenly suggests—diagnosed her with fibromyalgia in January 2017 and recommended she join a fibromyalgia support group.  *Id.*  Ryherd then discusses an evaluation by Dr. Haraldine A. Stafford in October 2016, noting that Dr. Stafford did not expressly diagnose fibromyalgia, but that she gave Ryherd counseling and literature on fibromyalgia.  *Id.* at pg. 7.  Ryherd further identifies that Dr. Renee C. Stucky, a psychologist who treated Ryherd in 2017, included fibromyalgia in a list of Ryherd's diagnoses.  *Id.* at pg. 8.  In light of this evidence, Ryherd asserts that the ALJ should have requested a consultative evaluation if he had any doubts about the appropriateness of Ryherd's fibromyalgia diagnosis, rather than outright rejecting the diagnosis.

The Commissioner offers no discernable argument in response to Ryherd's claims and merely reiterates the ALJ's conclusory finding with an equally conclusory statement that "the evidence did not support the criteria for a medically determinable impairment of fibromyalgia."[2]  (ECF 22 at pg. 9.)

---

[2] Following a cursory summary of the ALJ's fibromyalgia evaluation, the Commissioner cites to several cases ostensibly supporting the proposition that Ryherd did not have a severe combination of impairments.  (ECF 22 at pg. 9.)  The Commissioner then argues that the ALJ's Step Two determinations were harmless because he also considered Ryherd's non-severe impairments in his RFC assessment.  (*Id.* at pg. 10.)  However, because the ALJ determined that Ryherd did not have a medically determinable impairment of fibromyalgia, he did not proceed to an evaluation of the severity of the condition, and he did not consider the effects of fibromyalgia in determining Ryherd's RFC; consequently, to the extent the Commissioner offers the above arguments and caselaw in support of the ALJ's fibromyalgia analysis, the Commissioner's arguments are not persuasive.

- 17 -

ii.     *Evidence of Ryherd's Fibromyalgia*

The record contains overwhelming evidence that Ryherd has struggled with widespread joint pain, tenderness to touch, and chronic fatigue for several years. (*See, e.g.* Tr. 357, 382, 603, 1056, 1067, 1139, 1144-45, 1154-55, 1177, 1192-93, 1217, 1225, 1244-45, 1260, 1276-77, 1353.)  These and the following records reflect that Ryherd's many treating physicians historically had difficulty determining the underlying cause of her pain symptoms; at various points, Ryherd was diagnosed or otherwise observed to have rheumatoid arthritis, osteoarthritis, polymyalgia rheumatica, chronic polyarthralgia, myofascial pain syndrome, central sensitization, unspecified myalgia and myositis, and general chronic pain. However, Ryherd was essentially diagnosed with fibromyalgia in October 2016, and her fibromyalgia diagnosis has been repeatedly tested, confirmed, and recorded—by multiple different treating physicians across varying medical disciplines—since her initial diagnosis.  I will summarize the chronological development of her diagnosis below.

It appears that the first reference to fibromyalgia is contained in the treatment notes of Dr. Stafford, MD, a rheumatologist at the University of Iowa Hospitals & Clinics, who first treated Ryherd on October 25, 2016.  (Tr. 1357.) Ryherd was referred to Dr. Stafford by her primary care physician, Dr. Greg

Randolph, MD, in order to evaluate her "chronic polyarthralgia[3] and elevated inflammatory markers." (Tr. 1357.) In a detailed summary of Ryherd's medical history, Dr. Stafford described, among other things, Ryherd's complaints of chronic lower back, knee, and joint pain; the numerous steroid injections she had received over the years for her pain; her chronic nonrestorative sleep problems; and her family history of rheumatoid arthritis and fibromyalgia. (Tr. 1357-58.)

Dr. Stafford performed a physical examination of Ryherd noted Ryherd had "marked tenderness around her bilateral elbows . . . and pain with any type of movement of the elbow or wrists," as well as "painful and limited active range of motion in her shoulders." (Tr. 1360-61.) Dr. Stafford further found "multiple fibromyalgia tender points in the trapezius, supraspinatous, epicondyles, greater trochanters and knees bilaterally also positive control points." (Tr. 1361.) In her post-examination discussion, Dr. Stafford described Ryherd as having "significant central sensitization from chronic musculoskeletal pain and hypermobility both of which are aggravated by her significant sleep and mood disturbances."[4] (*Id*.)

---

[3] Arthralgia is a symptom classified by non-inflammatory joint pain and tenderness; polyarthralgia is the presence of arthralgias in two or more joints. Polyarthralgia is not a disease in and of itself, but a description of symptoms which can have several causes, including fibromyalgia or autoimmune diseases like rheumatoid arthritis. *See* https://www.healthline.com/health/polyarthralgia.

[4] Central sensitization encompasses many disorders where the central nervous system amplifies sensory input across many organ systems and results in myriad symptoms, including chronic, widespread pain. Individuals with fibromyalgia are often diagnosed with central sensitization due to a "considerable overlap" in definitions and diagnostic criteria. *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4422459/.

- 19 -

Dr. Stafford officially diagnosed Ryherd with polyarthralgia, elevated sedimentation rate, elevated C-reactive protein,[5] lateral epicondylitis of both elbows, bilateral carpal tunnel syndrome (which she assessed was "probably due to [Ryherd's] central sensitization"), chronic musculoskeletal pain, hypermobile joints, periarthritis of shoulder, unspecified laterality, and muscle weakness.  (Tr. 1361.)  After reviewing additional medical records, Dr. Stafford noted in an addendum that Ryherd had normal inflammatory markers and thus "most likely has a seronegative inflammatory polyarthritis . . . ."[6]  While Dr. Stafford did not explicitly list fibromyalgia in Ryherd's encounter diagnoses, she concluded her session with Ryherd by counseling her "regarding the etiology, natural history and treatment of fibromyalgia," providing Ryherd with "literature regarding this [fibromyalgia] diagnosis," and advising her to read the book "Good Living With Fibromyalgia."  (Tr. 1361-62.)  She further advised Ryherd to ask her primary care provider to consider prescribing Cymbalta.[7]

---

[5] Studies have found a strong positive association between elevated C-reactive protein levels and fibromyalgia.  *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5501008/.

[6] Seronegative arthritis is typically diagnosed when an individual displays symptoms consistent with rheumatoid arthritis, but they test negative for rheumatoid factor (RF) and/or anti-citrullinated peptides (CPP) antibodies. https://www.rheumatoidarthritis.org/ra/types/seronegative/.  Studies have found a strong association between seronegativity and fibromyalgia.  *See* https://onlinelibrary.wiley.com/doi/full/10.1002/art.39851.

[7] Cymbalta is a prescription brand for the drug duloxetine, which is prescribed *inter alia* to treat depression and anxiety, as well as relieve chronic pain for individuals with fibromyalgia or arthritis.  *See* https://www.webmd.com/drugs/2/drug-91491/cymbalta-oral/details.

Ryherd moved from Iowa to Missouri in September 2016, and on November 2, 2016, she was treated by Dr. Jon Rampton, DO, her new primary care physician. (Tr. 1518.)  Dr. Rampton included both rheumatoid arthritis and fibromyalgia in his summary of Ryherd's medical history.  (Tr. 1519.)  Dr. Rampton performed a physical examination and noted "generalized decreased ROM/stiffness" upon review of Ryherd's musculoskeletal system.  (Tr. 1520.)  In the assessment section of his treatment notes, Dr. Rampton diagnosed Ryherd with hypothyroidism, depressive disorder, sleep apnea, rheumatoid arthritis, and chronic pain syndrome, noting the chronic pain was "related to her [rheumatoid arthritis], fibromyalgia, and polymyalgia rheumatica."  (Tr. 1521.)  Dr. Rampton prescribed Ryherd with duloxetine (Cymbalta) and referred her to Dr. Ebby George Varghese, MD, a pain management specialist.

Ryherd was treated by Dr. Varghese at the University of Missouri Interventional Pain Clinic on January 17, 2017; Dr. Varghese included fibromyalgia, as well as polymyalgia rheumatica and rheumatoid arthritis, in a list of Ryherd's past medical history.  (Tr. 1371.)  Dr. Varghese relayed Ryherd's comment that Cymbalta was helping with her widespread pain, but that it made her feel "foggy."  Among other things, he also noted Ryherd's complaints of aching and stabbing pain throughout her body, and specifically in her neck, shoulders, elbows, knees and ankles.  (Tr. 1371.)  After conducting a physical examination,

- 21 -

Dr. Varghese provided the following assessment:

> The patient is a 46-year-old female suffers from chronic widespread
> pain secondary to fibromyalgia.  She has a good response to Cymbalta
> though she does have some side effects to that medication.  She also
> has a diagnosis of rheumatoid arthritis and polymyalgia rheumatica.
> She's had multiple steroid injections over the last 12 month period by
> her pain management physicians in orthopedics in Iowa.  She suffers
> from right knee osteoarthritis.  She has a history of an L5-S1 lumbar
> spinal fusion.  She does have a history of severe depression with one
> suicide attempt 2 years ago.

(Tr. 1372.)  Dr. Varghese recommended Ryherd switch her medication from

Cymbalta to Savella, noting she could restart Cymbalta or try Lyrica if she was

unable to tolerate Savella.[8]  He referred Ryherd to Dr. Renee Stucky for cognitive

behavioral therapy, and also recommended Ryherd join a fibromyalgia support

group.  (Tr. 1373.)

Ryherd was treated by Dr. Rampton on March 15, 2017.  (Tr. 1513-14.)

Fibromyalgia was included in a list of Ryherd's past medical history.  (Tr. 1516.)

Dr. Rampton performed a physical examination and noted "generalized decreased

ROM/stiffness" of Ryherd's musculoskeletal system.  (Tr. 1517.)  Ryherd's post-

exam diagnoses included hypothyroidism, depressive disorder, sleep apnea,

rheumatoid arthritis, chronic pain syndrome (again with the note "this is related to

her [rheumatoid arthritis], fibromyalgia, and polymyalgia rheumatica"), and

---

[8] Savella and Lyrica are both prescription medications for managing fibromyalgia.  *See*
https://www.webmd.com/fibromyalgia/guide/savella-for-fibromyalgia-treatment#1.

gastroesophageal reflux disease.  (Tr. 1517.)  Ryherd was prescribed Savella and other medications.

On April 13, 2017, Ryherd returned to the University of Missouri Interventional Pain Clinic for a follow-up visit and was treated by Blair Elise Lansford, ANP.  Lansford recorded Ryherd's complaints of a "widespread pain picture" of an "aching and burning" character present in her shoulders, shoulder blades, low back, elbows, wrists, hands, right knee, and ankles.  (Tr. 1379.)  She also noted Ryherd's comments that she feels "dizzy, foggy headed her head feels swollen," and that she is sometimes "forgetful at where she is going" while driving.  (Tr. 1379.)  After conducting an examination, Lansford repeated Dr. Varghese's assessment that Ryherd "suffers from chronic widespread pain secondary to fibromyalgia."  (Tr. 1380.)  Lansford ascribed Ryherd's symptoms of foggy headedness, dizziness, and head feeling swollen as potentially "related to fibromyalgia," noting the symptoms became more noticeable after Ryherd was weaned off of Cymbalta, her previous fibromyalgia medication.  (Tr. 1381.)  Lansford ultimately recommended "maximizing FDA approved medications for fibromyalgia," and suggested Ryherd increase her dosage of Savella.  (Tr. 1380-81.)

On June 7, 2017, orthopedic surgeon Dr. Seth L. Sherman, MD, performed an arthroscopy of Ryherd's right knee to investigate a preoperative diagnosis of

patellofemoral chondral disease and determine the source of Ryherd's ongoing

pain.  (Tr. 1425.)  After the surgery, Dr. Sherman noted that Ryherd has "a

complex problem list within the knee," but as relevant here, he concluded:  "The

[patellofemoral] joint overall did not have obvious findings consistent with

rheumatoid arthritis."  (Tr. 1427.)  Dr. Sherman requested Ryherd get a second

opinion to confirm his findings.

It appears that Ryherd had a pre-operative visit with Dr. Daniel Gilbert, DO,

on July 3, 2017 in preparation for a surgical procedure on her back.  (Tr. 1453.)

Dr. Gilbert described Ryherd's "chronic back pain" and included her fibromyalgia

diagnosis in a summary of Ryherd's medical history.  (Tr. 1455.)

Ryherd had an appointment with Dr. Renee Stucky, PhD, a psychologist, on

July 11, 2017.  (Tr. 1467.)  Dr. Stucky described Ryherd's "history of persistent

pain," and included Ryherd's fibromyalgia diagnosis and in her initial summary of

Ryherd's history and post-visit list of diagnoses.  (Tr. 1467-68.)  Among other

things, Dr. Stucky noted that Ryherd had discontinued taking Savella and

Cymbalta and had resumed taking Effexor, a previously prescribed antidepressant;

while Ryherd reported that she felt "significantly cognitively clearer" and

generally less depressed on her new medication regime, Ryherd also reported an

increase in pain and complained that she had more difficulty moving in the

mornings.  (Tr. 1468.)

On Dr. Sherman's referral, Ryherd was evaluated by Deanna Davenport,

FNP, at the University of Missouri Rheumatology Clinic on July 13, 2017.  (Tr.

1480.)  Davenport noted Ryherd had been diagnosed with fibromyalgia and

recorded "she does have the standard generalized body pain and tenderness to

touch of fibromyalgia," while also noting that there was "some concern for

possible developing [rheumatoid arthritis]."  (Tr. 1480.)  Davenport performed a

physical examination and fibromyalgia tender point test, and provided the

following summary related to Ryherd's musculoskeletal system:

> Ms. Ryherd has no joint swelling or deformity to hands, wrists, she is
> tender diffusely to touch, normal motion.  Elbows w/o swelling or
> nodulosis, normal motion.  Shoulders with some diffuse periarticular
> discomfort to ROM, no impingement today.  **18/18 [fibromyalgia]
> tender points**.  Hips w/o groin pain to move, aggravates low back
> discomfort.  Knees are cool, healing port sites on left, tenderness
> bilaterally, normal motion.  Trace pretibial edema, no joint line
> swelling to ankles, no loss of motion, patient reports they feel "stiff".
> No metatarsalgia or dactylitis/enthesities.

(Tr. 1482, emphasis added.)  In her post-evaluation impressions, Davenport stated:

"Distribution of joint pain is concerning for [rheumatoid arthritis], but exam w/o

joint swelling/synovitis. Tenderness difficult to interpret in light of fibromyalgia."

(Tr. 1484.)  Davenport explicitly diagnosed Ryherd with fibromyalgia, and

concluded by ordering over a dozen laboratory tests to rule out any other "mimics

or aggravators" for Ryherd's symptoms.  (Tr. 1485.)

Ryherd saw Davenport for a follow-up visit on August 4, 2017, and

- 25 -

Davenport again noted that Ryherd had "standard generalized body pain and tenderness to touch of fibromyalgia." (Tr. 1487.)  Davenport performed another physical examination of Ryherd, including a tender point test, and again found all 18/18 fibromyalgia tender points.  (Tr. 1489.)  Davenport summarized Ryherd's laboratory test results and explained that Ryherd had "a strong positive anti-CCP,[9] but that's it." (Tr. 1489.)  Davenport continued:  "This could be a false positive, or she may develop [rheumatoid arthritis] down the road, but I don't think current daily [symptoms] are from [rheumatoid arthritis]." (Tr. 1489.)  Davenport concluded:  "I understand the 'questionable' [rheumatoid arthritis] diagnosis now.  However, at this point I do feel daily [symptoms] more likely from [fibromyalgia] than [rheumatoid arthritis]." (Tr. 1487.)  In her post-visit summary, Davenport diagnosed Ryherd with fibromyalgia, and concluded that there were no other missed "underlying aggravators." (Tr. 1489.)  Davenport prescribed Lyrica, noting Ryherd had previously stopped taking her Cymbalta and Savella due to negative side effects.

> ### iii.    Discussion

The record is replete with evidence of the existence of Ryherd's fibromyalgia, including Ryherd's testimony; her consistent, well-documented

---

[9] The anti-ccp antibody test is commonly used to diagnose rheumatoid arthritis.  *See* https://www.ncbi.nlm.nih.gov/pubmed/17434910.

complaints of chronic and widespread joint pain, fatigue, and other symptoms of fibromyalgia; the observations and diagnoses of Ryherd's treating physicians, including pain specialists and rheumatologists; her prescription of several different fibromyalgia medications, including Cymbalta, Savella, and Lyrica; and the various diagnostic test results indicative of both the existence of fibromyalgia and non-existence of other disorders (i.e. rheumatoid arthritis) which could potentially explain Ryherd's symptoms.  A review of the record as a whole shows that the observations and physical examinations of Ryherd's treating physicians and medical providers are consistent with each other's findings and consistent with the medical diagnosis of fibromyalgia.

Without any articulated explanation or evidentiary basis—indeed, the ALJ did not even specify which of the three 1990 ACR diagnostic criteria he believed was unsupported by the evidence—the ALJ either ignored or rejected the opinions of no fewer than five treating physicians who either expressly diagnosed Ryherd with fibromyalgia, evaluated her symptoms as consistent with fibromyalgia, or included her fibromyalgia diagnosis in their records.[10]  In rejecting Ryherd's

---

[10] I acknowledge here that two of the sources who tested and diagnosed Ryherd with fibromyalgia, ANP Lansford and FNP Davenport, are licensed nurse practitioners.  Accordingly, because Ryherd's claim was filed before March 27, 2017, they are not considered "acceptable medical sources" for purposes of establishing a medically determinable impairment of fibromyalgia.  *See* 20 C.F.R. § 404.1502(a)(7).  Instead, they must be considered as "other medical sources" who may "provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."  *See Brown v. Colvin,* No. 15-3528-CV-S-REL-SSA, 2016 WL 7013482, at *19 (W.D. Mo. Nov. 30, 2016).  Regardless, Lansford and Davenport's

diagnosis, the ALJ "ignored the law of this circuit, which states that the ALJ must not substitute his opinions for those of a physician." *Ness v. Sullivan*, 904 F.2d 432, 435 (8th Cir. 1990); *see also Delrosa*, 922 F.2d at 485 (ALJ committed "egregious error" by rejecting express diagnosis given by a treating physician). "Such disregard of the record constitutes reversible error." *Pratt v. Sullivan*, 956 F.2d 830, 834 (8th Cir. 1992) (citing *Delrosa*, 922 F.2d at 484-85).

Further, the ALJ's erroneous evaluation of Ryherd's fibromyalgia calls into question the resulting RFC assessment. *See Holmstrom v. Massanari*, 270 F.3d 715, 722 (8th Cir. 2001). At Step Four, the ALJ concluded that Ryherd's statements concerning the intensity, persistence, and limiting effects of her symptoms were "inconsistent with the medical evidence." (Tr. 22.) The ALJ then discussed Ryherd's treatments for her knee, back, shoulder, osteoarthritis, and sleep apnea impairments, ultimately concluding that Ryherd's treatments "fails to support her allegations of disability" from each impairment. (Tr. 22-23.) However, because the ALJ determined that Ryherd did not have a medically

---

records are consistent with the record, Ryherd's testimony, and the findings of Dr. Stafford and Dr. Varghese, both of whom expressly or impliedly diagnosed Ryherd with fibromyalgia. Should the ALJ question the findings of Dr. Stafford or Dr. Varghese, or otherwise conclude that their records provide insufficient evidence to support the existence of Ryherd's fibromyalgia diagnosis, the ALJ must recontact the sources to gain additional information or records as needed to resolve the insufficiency, or order a consultative examination so that he may make an informed decision. *Delrosa v. Sullivan*, 922 F.2d 480, 485 (8th Cir. 1991); SSR 12-2p.

determinable impairment of fibromyalgia, he did not consider the widespread and potentially debilitating effects of fibromyalgia, alone or in combination with her other impairments, in assessing Ryherd's limitations.  "When a claimant has multiple impairments, 'the Social Security Act requires the Commissioner to consider the combined effect of all impairments without regard to whether any such impairment, if considered separately could be of sufficient medical severity to be disabling.'" *Gann v. Colvin*, 92 F. Supp. 3d 857, 881 (N.D. Iowa 2015) (quoting *Cunningham v. Apfel*, 222 F.3d 496, 501 (8th Cir. 2000)).

Moreover, at Step Four, the ALJ gave significant weight to the opinions of Drs. Byrnes, Hunter, and Levy, who opined that Ryherd could perform work at the light to sedentary level, and little weight to the opinion of Dr. Buchanon, who opined that Ryherd could only perform work at the sedentary level.  (Tr. 24.) However, all four opinions were rendered during or before February 2016, and thus before Dr. Stafford presumptively diagnosed Ryherd with fibromyalgia in October 2016; accordingly, their opinions concerning Ryherd's RFC were not adequately informed.  *See Garza v. Barnhart*, 397 F.3d 1087, 1089 (8th Cir. 2005) (remanding case where ALJ relied on a physical RFC assessment made by a reviewing physician before the claimant was diagnosed with fibromyalgia).

D. Conclusion

The ALJ failed to properly evaluate substantial evidence demonstrating the

existence of fibromyalgia and failed to fully and fairly develop the record as to the effect of her impairment on her ability to work.  The ALJ also erred in giving weight to the medical opinions of treating and consulting physicians who did not have access to Ryherd's entire medical history, including any of the evidence of Ryherd's fibromyalgia diagnosis and her subsequent treatment records.  The ALJ's RFC determination is thus not supported by substantial evidence on the record as a whole, and so I will remand the matter to the Commissioner for further proceedings.

Upon remand, the Commissioner may obtain and provide the parties an opportunity to submit additional medical evidence that addresses Ryherd's fibromyalgia and her ability to function in the workplace in light of the impairment.  This may include contacting Ryherd's treating physicians to reevaluate the record and clarify their limitations in order to ascertain the level of work, if any, Ryherd is able to perform.  *See Coleman v. Astrue*, 498 F.3d 767 (8th Cir. 2007); *Smith v. Barnhart*, 435 F.3d 926, 930-31 (8th Cir. 2006).  As noted above, the ALJ is permitted to order additional examinations and tests to assist in making an informed decision regarding Ryherd's fibromyalgia and the extent, if any, to which the impairment affects her ability to perform work-related activities. *Dozier v. Heckler*, 754 F.2d 274, 276 (8th Cir. 1985); 20 C.F.R. § 404.1517.

Should the ALJ determine Ryherd has a medically determinable impairment

of fibromyalgia, the ALJ must evaluate whether her fibromyalgia medically equals a listing in the Listing of Impairments, subpart P, 20 CFR part 404 (appendix 1) (for example, listing 14.09D for inflammatory arthritis).  The ALJ must also reevaluate Ryherd's RFC, which—due to the nature of fibromyalgia's complex symptoms—must include reassessing the record evidence and Ryherd's subjective statements of symptoms related to all of her severe and non-severe physical and mental impairments.[11]  This reevaluated RFC shall be based on some medical evidence in the record and shall be accompanied by a discussion of the evidence in a manner that shows how the evidence supports each RFC conclusion.  Any medical opinion evidence relied on in determining Ryherd's RFC must properly informed and supported by the record as a whole.  "[I]f it is still necessary, the ALJ may pose a revised hypothetical to a [vocational expert]."  *Id*. at 1089 (citing *Forehand,* 364 F.3d at 988 (noting in a fibromyalgia case that RFC determination requires consideration of whether claimant can perform requisite physical acts on daily basis in sometimes competitive and stressful conditions in the real world).

I will refrain from considering Ryherd's remaining arguments in this Order, specifically concerning the ALJ's analysis of Ryherd's alleged depression and anxiety, sleep apnea, bilateral carpal tunnel syndrome, and bilateral shoulder tendinosis, as the ALJ will potentially have to revisit his conclusions as to these

---

[11] With the exception of Ryherd's alleged dyslexia, as set forth below.

impairments as set forth above.  However, I conclude that the ALJ's determination that Ryherd did not have a medically determinable impairment of dyslexia is supported by substantial evidence, as there is no evidence in the record that she received a diagnosis. (Tr. 20, 1400.)

The ALJ's decision as to whether Ryherd has a medically determinable impairment of fibromyalgia—and her ultimate status of non-disabled—may not change after obtaining and properly considering all relevant evidence and undergoing the required analysis; however, the determination is nevertheless one that the Commissioner must make in the first instance.  *See Pfitzer v. Apfel*, 169 F.3d 566, 569 (8th Cir. 1999).

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED** in part as set forth herein, and this cause is **REMANDED** for further proceedings.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.


_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 21st day of May, 2020.